**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

MICHELLE JONES,              )
                                       )
        Plaintiff,          )
                                       )
v.                            )     No. 6:15-cv-03336-NKL
                                       )
CAROLYN W. COLVIN,       )
Acting Commissioner of Social Security,   )
                                       )
        Defendant.     )

**ORDER**

Plaintiff Michelle Jones appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits and supplemental security income. The decision is affirmed.

**I.     Background**

Jones alleges disability beginning April 23, 2012. She was born in 1974, graduated from high school, and last worked from 2008 to 2011 as an order clerk. Her work history also included factory work, building boat canopies and assembling air conditioner compressors in 2007 and 2008; working as a restaurant server from 2004 to 2006; assembling harnesses for boat electrical systems in 2000; and working in a photography studio in 1998 and 1999.

**A.     Medical history**

On December 5, 2008, Jones fell and injured her left wrist at work. Dr. Justin Ogden diagnosed a fracture, and surgery was performed on Jones' left wrist three days later. Jones did well following surgery and returned to full-duty work on December 19, 2008. Jones saw Dr. Ogden again on January 15, 2009. She told him she had been working in the wrist guard, and was doing well overall despite some stiffness and occasional pain. Wrist x-rays showed

evidence of a healing fracture. Her surgical site was well-healed, and she could extend 45 degrees and flex 30 degrees, extend her thumb and index finger, and abduct all fingers. Sensation was intact. The doctor recommended hand therapy and grip exercises. Jones failed to attend her February 6, 2009 follow-up appointment.

At an evaluation in March 2009, Chris Williams, a physical therapist, wrote that Jones' wrist incision was well-healed and she had no significant edema. Mr. Williams recommended physical therapy, and noted Jones' prognosis was excellent.

On February 20, 2009, an MRI of Jones's right knee showed a torn ACL and nondisplaced fracture of the lateral tibial plateau. She was prescribed a wheelchair. Jones reported to Dr. Ogden on March 26, 2009 that she had twisted her knee. Since then, she said, she had had difficulty with motion and weight bearing. Dr. Ogden recommended weight bearing as tolerated and provided a home exercise program.

Jones had a sleep study in March 2010, and was diagnosed with mild to moderate obstructive sleep apnea. Dr. Blake Little recommended weight loss and a follow-up study to determine CPAP duration.

Dr. Robert Paul examined Jones on July 2, 2010 in connection with her worker's compensation claim for her left wrist. She reported that she continued to have pain in her left wrist most of the time with cramping, weakness, and range of motion loss. Dr. Paul opined that Jones should not use her left wrist or hand for excessive, heavy, or repetitive work and that she should not lift more than 30 pounds with the left arm above waist height. The doctor opined that Jones had a 30 percent chronic disability due to chronic pain, loss of range of motion and weakness in the left wrist and handgrip. He also noted Jones would almost certainly develop arthritis in the wrist.

On March 30, 2011, Jones reported to her primary care physician, Dr. Neil Schwartzman, that she was concerned about her thyroid. She said she experienced hair loss and an inability to lose weight, despite dieting and exercising. Dr. Schwartzman diagnosed alopecia. At her next appointment with the doctor in May 2011, Jones reported that she had lost 10 pounds taking Bontril.

Jones went to the emergency room on March 26, 2012, for dizziness, headaches, and numbness since the day before. She reported that she was taking no medication for headaches at that time. She was sensitive to loud noise and bright light, and complained of vomiting, difficulty focusing her vision, focal weakness in her upper right arm, and that the right side of her tongue was numb. Examination revealed no cranial nerve deficit or sensory deficit. A CT scan of the brain was unremarkable. Jones was admitted for observation and discharged two days later, reporting that she felt much better despite a residual headache. Her discharge diagnoses were intractable headaches, likely migraine; dizziness; and hypokalemia. The doctor prescribed Norco and prednisone, and advised Jones to continue her Mobic and Ultram.

Jones returned to Dr. Schwartzman on March 30, 2012 to follow up after her hospitalization. She reported that she felt much better with only slight residual dizziness. The doctor noted Jones had no photophobia, noted to neurologic findings, and prescribed Treximet.

Jones went to the emergency room again on April 12, 2012 for a bad headache. She reported blurred vision in the right eye with no numbness or tingling, and was diagnosed with migraine headache.

On April 17, 2012, Jones followed up with Dr. Schwartzman, reporting a recurrent headache with nausea and vomiting. The doctor noted she had no photophobia and no focal motor or sensory deficits, and prescribed Inderal.

3

Jones had a two-year follow-up appointment in October 2012 with Dr. Little concerning sleep apnea. She said she had lost her CPAP machine in a house fire and had obtained a replacement in the last couple of months. She reported that she used the machine most nights and "definitely feels better when she" does, and was getting five and a half hours of sleep per night. [Tr. 368.] Dr. Little instructed Jones to follow up in one year.

On December 10, 2012, Jones saw Dr. Schwartzman for migraines, wrist pain, and cough and congestion. The doctor noted he had not seen Jones in a while. Jones said her migraines had decreased from four to five per week to two to three, and that Maxalt was effective when she had it. Upon examination, the doctor noted there were no focal neurologic findings, and that Jones had discomfort in the wrist up to the thumb. He diagnosed sinusitis, migraine, and tenosynovitis.

Jones returned to Dr. Schwarzman on January 25, 2013 for wrist pain and congestion. She said her wrist was better when she was taking prednisone. The doctor noted fullness in Jones' wrist, with decreased range of motion and tenderness, and administered an injection in the wrist.

Jones complained of a tingling sensation in her left arm on February 12, 2013. An EKG was normal. Andrew Neal, a nurse practitioner, assessed paresthesia of the left arm.

Jones went to the emergency room on February 19, 2013 for a headache that had lasted two days and not improved with Maxalt. She had vomited one day, but had no dizziness, numbness, photophobia, or visual disturbance. The doctor diagnosed migraine.

Jones began seeing Dr. Robert Wyrsch on February 27, 2013 for treatment of her left wrist pain, which she said was worsening. Dr. Wyrsch's impression was of painful hardware with irritation of the first dorsal compartment tendons. He recommended hardware removal and first dorsal compartment release. Jones subsequently had the hardware removed from her wrist

4

on March 7, 2013.   Following hardware removal, she developed numbness and tingling in the left hand.  Dr. Wyrsch recommended stretching and using a splint.

On June 13, 2013, Jones reported to Dr. Schwartzman that she was having two to four a week and that her Maxalt was taking the edge off but not resolving them.  She also reported continued weight gain despite dieting and exercising, and fatigue.  Dr. Schwartzman assessed migraine headache, abnormal weight gain, morbid obesity, malaise and fatigue, goiter, and depressive disorder.

On June 17, 2013, Jones went to the emergency room for numbness in her left middle and index fingers, and complaint of mild pain.  She reported a history of migraines, but denied headache or vomiting at that time.   Examination revealed she was in no distress, and had normal neurological findings, full range of motion, no edema, and no tenderness.   The doctor diagnosed paresthesia.  Upon discharge, Jones was instructed to wear a wrist splint at night and continue her medications, including Mobic, an anti-inflammatory.

Jones followed up with Dr. Wyrsch on July 10, 2013 concerning the hardware removal surgery.[1]  She had some tingling in the fingers.  Dr. Wyrsch noted Jones appeared to be in no acute distress.   Examination revealed no swelling, and excellent wrist motion without any significant pain.  There was no atrophy in her hand, and her first dorsal compartment tendons were completely nontender.  Phalen's and Tinel's tests were positive, indicating carpal tunnel syndrome.   The doctor administered an injection in the wrist and recommended Jones return in six weeks.

At a visit on August 12, 2013 with Dr. Wyrsch, Jones complained of increased numbness,

---

[1]    The ALJ permitted Jones to submit records of her 7/10/2013 visit with Dr. Wyrsch, as well as records of subsequent medical visits, after the administrative hearing of 7/15/2013.

Case 6:15-cv-03336-NKL   Document 12   Filed 03/07/16   Page 5 of 23

tingling, and night pain in the wrist. The doctor noted Jones had good reduction of wrist pain and was in no acute distress. There was some wrist swelling, and Phalen's and Tinel's tests were positive. The doctor's impression was that Jones was doing well and had symptoms of carpal tunnel syndrome in her left hand. He recommended using a night splint and starting a stretching program, with follow up in six weeks.

On August 13, 2013, Jones saw Dr. Schwarzman, reporting that she had migraines despite preventatively taking Inderal and Elavil and using Maxalt frequently. She estimated having two to four headaches per week. Although it did not resolve her headache, Maxalt took the edge off. The doctor noted there were no focal neurologic findings, that Jones moved all extremities well and equally, and that she had a neck goiter. The doctor's assessment was migraine headaches, abnormal weight gain, morbid obesity, malaise and fatigue, goiter, and depressive disorder.

### B. Treating physician's opinion, and other opinion evidence

On May 15, 2013, Dr. Blake Little completed a medical source statement, noting Jones had sleep apnea and used a CPAP machine. He opined that Jones experienced mild to moderate daytime somnolence, but that it was not so severe as to prevent her from working.

Charles J. Ash, M.D., an orthopedist, performed a consultative examination of Jones on July 29, 2013.[2] Under the History section of the doctor's narrative report, Dr. Ash wrote that Jones has had pain, stiffness and swelling in the right knee since a 2009 injury, and she could walk for about one hour before having to stop. [Tr. 499.] The doctor also wrote that Jones had an open reduction fracture of the left wrist in 2008 with removal of metal in 2013, and had stiffness and pain with use and numbness in the index and long fingers. [*Id.*]

---

[2] The ALJ sent Jones for this evaluation after the administrative hearing.

On examination, Dr. Ash found limited bilateral wrist range of motion, tenderness, and decreased sensation of the left index and long fingers, but fair grip and pinch strength at four out of five, satisfactory pulses, and equal and active reflexes. Motion of the shoulders, elbows and forearms were all normal. Dorsiflexion, radial deviation, and ulnar deviation of the wrists were normal. Although Jones had slight knee tenderness, she had nearly normal range of motion in her hips, knees, and ankles. Dr. Ash found no instability, effusion, deformity, or sensory deficit. He diagnosed possible ligamentous right knee injury, probable degenerative arthritis in the left wrist, and probable degenerative arthritis of the lumbar spine. [Tr. 499-500.]

Dr. Ash completed a medical source statement form. [r. 491-97.] He opined that Jones could lift and carry 11 to 20 pounds occasionally, and up to 10 pounds frequently. She could sit, stand, and walk for one hour at a time. In an eight-hour day, she could sit for eight hours and stand and walk for two hours. The doctor noted Jones was right-handed, and assessed no limitations on Jones' use of her hands, shoulders, or feet. Jones could never climb ladders or scaffolds, and she could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. As for environmental limitations, Jones could never be exposed to unprotected heights, and could occasionally tolerate exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, extreme cold and heat, vibrations, and dust, odors, fumes, and pulmonary irritants. The doctor limited Jones to loud noise, such as heavy traffic. Finally, he opined that Jones could perform all daily activities listed on the form, including shopping, traveling alone, ambulating alone, preparing simple meals, caring for personal hygiene, and sorting, handling, or using paper and files. Dr. Ash noted that his medical source statement was based on the objective findings. [Tr. 500.]

C.    Jones' self-reports, the hearing testimony, and other evidence

In her Disability Report, Jones wrote she stopped working on April 23, 2012 because of severe migraines and left wrist pain.

In her Function Report dated June 5, 2012, Jones stated that for three to four hours almost every day, she cleaned did laundry and dishes, helped her son with schoolwork, cooked dinner, and cared for her dogs. She had no problems with personal care. She no longer mowed because the vibration hurt her wrist. She went out alone, drove, shopped weekly, managed her finances, and went to church twice weekly. She remembered appointments without reminders and followed written and verbal instructions. She described hobbies of watching television, photography, and making jewelry. Making jewelry made her hand cramp. She could walk a couple of miles before needing to rest.

Jones completed a headache log for the period February 5, 2013, through July 11, 2013 at her attorney's request. She noted having missed church services, missing Fourth of July fireworks, and going to the emergency room for migraines.

At the administrative hearing held July 15, 2013, Jones testified she lived with her husband and 14-year-old son. On a typical day, she cleaned, cared for her child, cooked dinner, and did laundry. Jones testified that her wrist problem and migraines were the biggest things that prevented her from working. She injured her left wrist and had difficulty bending it, as well as numbness in her fingers. She also had carpal tunnel in her left hand. She is right-handed. She had difficulty typing on a computer. She had difficulty gripping small objects, but not as much difficulty with big objects. She said lifting with her left hand hurt, but she had no difficulty lifting with her right hand.

Jones also described right knee problems after tearing her ACL. She never had surgical

8

repair. Her doctor recommended exercise and physical therapy. Jones said she elevated her leg every day for 30 minutes to one hour. Jones testified she could stand for 30 minutes at one time, walk for 20 to 30 minutes at a time, and sit for one to two hours at a time.

Jones was five feet, eight inches tall, and she weighed 302 pounds. She typically weighed between 220 and 230 pounds, and she attributed her weight gain to a thyroid mass. Jones stated that no one had indicated her thyroid condition caused any functional effects other than weight gain. Jones testified that she took medications to prevent migraines, and had two to five migraines per week. She said her migraines did decrease her awareness, but her migraine medication did, and also made her sleepy. She did not cook when she had a migraine. Migraines made her sensitive to light and sound. They caused nausea most of the time, but not vomiting. She had to lie down in a dark, quiet room for one hour and up to three days when she had a migraine. Jones testified that she had had migraines for 10 to 15 years, and that they had progressively worsened over time. She has never been seen by a headache specialist. Jones testified that her doctor had never recommended she see a specialist, and as far as her doctor was concerned, the only way to treat her migraines was with medication. [Tr. 64.]

Jones testified that she did not sleep well and was constantly tired despite using a CPAP machine.

Jones also said she experienced depression. She did not want to do anything or be around anyone when she felt depressed, and would lock herself in her room once or twice a week to be alone. She had crying spells, agitation, difficulty going out in public, and difficulty concentrating.

A vocational expert testified at the hearing. The ALJ proposed a hypothetical individual with the following limitations: can perform a full range of sedentary work; cannot push or pull

levers with the upper left extremity; is right-hand dominant; cannot lift or carry above shoulder with right upper extremity; cannot push or pull levers or foot pedals with the lower extremity bilaterally; occasionally bend, twist, or turn whether seated or standing; never crawl, kneel, or climb ropes, ladders, or scaffolds; occasionally stoop, squat, couch, and climb stairs; frequently grip and grasp, handle, finger, and feel; never use air or vibrating tools or motor vehicles; never work at unprotected heights or around moving machinery; cannot work around heavy concentrations of dust, smoke, or fumes; cannot work in temperature extremes, cold, heat, humidity, or out of doors. The VE testified that an individual with these limitations could perform Jones's past relevant work as an order clerk. The hypothetical individual could still perform this work even if she experienced numbness in the thumb and first and tall fingers, and had to look at the left upper extremity to know whether she was gripping something. [Tr. 65-66.]

When asked by Jones' attorney whether "most sedentary jobs require bilateral manual dexterity," the VE said they did. [Tr. 66.] Jones' attorney then asked whether an individual who could not use the left hand to manipulate tools like jewelry tools or small tools could perform work at the sedentary level. The VE answered that if the person did not have "good use of both hands," then no. [Tr. 66-67.] The VE further testified that an individual with any one of the following limitations would be unable to perform any sedentary work: only occasional handling and fingering; requiring two additional, unscheduled 10 minute breaks; would miss work twice a month on an ongoing basis; or would be off task 20 percent of the time or would require redirection 20 percent of the time. [Tr. 67.] The VE testified that Jones' past relevant work would be eliminated if she could only have occasional, superficial contact with the public and coworkers.

Finally, the VE testified that his opinions were consistent and not in conflict with the

Case 6:15-cv-03336-NKL   Document 12   Filed 03/07/16   Page 10 of 23

Dictionary of Occupational titles, although some aspects were not addressed by the DOT. [Tr. 68.]

After receiving post-hearing evidence, the ALJ issued interrogatories dated October 25, 2013 to the VE, asking him to consider a hypothetical individual of Jones's age, education, training, and work experience who could lift and carry 11 to 20 pounds occasionally and up to 10 pounds frequently; could sit, stand, and walk for one hour at a time without interruption; sit for eight hours and stand and walk for two hours total in an eight-hour day; could never climb ladders or scaffolds; could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; could have no exposure to unprotected heights; and could have occasional exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, extreme cold and heat, vibrations, dust, odors, fumes, and pulmonary irritants. The individual could tolerate loud noise, such as heavy traffic noise. The VE testified that such an individual could perform Jones' past work as an order clerk, as well as the sedentary, unskilled jobs of food and beverage order clerk, and addresser. The VE stated there were no conflicts between her opinion and the Dictionary of Occupational Titles or the Selected Characteristics of Occupations.

### D.     The ALJ's decision

The ALJ found Jones has severe impairments of morbid obesity, thyroid mass, migraine headaches, status post-reduction fracture of the left wrist in 2008 with removal of the metal in 2013 and left hand numbness, carpal tunnel syndrome, degenerative joint disease, and tenosynovitis. The ALJ concluded Jones did not meet Listing 1.02, major dysfunction of joints; Listing 1.07, fracture of the upper extremity; Listing 9.00, endocrine disorders; Listing 11.03, non-convulsive epilepsy; or Listing 11.14, peripheral neuropathies.

The ALJ found Jones has the residual functional capacity to perform:

Case 6:15-cv-03336-NKL   Document 12   Filed 03/07/16   Page 11 of 23

> [L]ight work as defined in 20 CFR 404.1567(a) and 416.967(a), as the claimant is able to stand or walk up to two hours total in an eight-hour workday and she is able to sit for up to eight hours total in an eight-hour workday. However, the claimant can lift and carry eleven to twenty pounds occasionally (up to 1/3) and ten pounds frequently (1/2 to 2/3). Additionally, the claimant can only sit one hour at one time without interruption, stand one hour at one time without interruption, and walk one hour at one time without interruption. The claimant can never climb ladders, ropes, or scaffolds and can only occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. Furthermore, the claimant must have no exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, extreme cold, extreme heat, vibrations, dust, odors, fumes, and pulmonary irritants and [s]he can tolerate loud noise (heavy traffic).[]

[Tr. 18.]

The ALJ concluded that "the credibility of [Jones'] allegations is in question[.]" [Tr. 19.] The opinion of Dr. Little, a treating physician, was given little weight, and the opinion of Dr. Ash, the consultative examiner and orthopedic specialist, was given great weight.

The ALJ found Jones can perform past relevant work as an order clerk, a job existing in significant numbers of the national economy. The ALJ alternatively found that, consistent with the RFC, Jones could perform the job requirements of representative occupations including order clerk, food and beverage, and addresser. The ALJ concluded Jones is not disabled.

## II.    Discussion

Jones argues that the ALJ did not properly perform the credibility analysis before discounting her alleged limitations caused by migraines, and left wrist and hand impairments. Jones also argues that the RFC does not properly account for her migraines, and left wrist and hand impairments, even though the ALJ concluded at Step 2 that they were severe impairments. Jones asks for reversal and remand for further proceedings.

The Commissioner's findings are reversed "only if they are not supported by substantial

evidence or result from an error of law." *Byers v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A.     Credibility determination

When an ALJ determines that a claimant is not credible and decides to reject the claimant's statement, the ALJ must provide specific reasons for the credibility finding. *See Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991); *Prince v. Bowen*, 894 F.2d 283, 296 (8th Cir. 1990). The ALJ must specifically consider evidence related to the claimant's work record; daily activities; "the duration, frequency and intensity of pain; the precipitating and aggravating factors; the dosage and side effects of medication; and functional restrictions." *Delrosa*, 922 F.2d at 485 (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)); *see also* 20 C.F.R. 404.1529 and 416.929 (codifying the *Polaski* factors). *Compare Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) ("Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony.")

Credibility is "primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009) (internal quotation and citation omitted). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination." *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010) (internal quotation and citation omitted). *See also Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015) (a court does not reweigh the evidence presented to the ALJ and will

defer to the ALJ's credibility determination when supported by good reasons and substantial evidence).

Here, the ALJ considered the *Polaski* factors and the credibility determination is supported by substantial evidence on the whole record.

### 1.    Migraines

The ALJ concluded that Jones' daily activities were not as limited as one would expect given her complaints of disabling pain and other symptoms due to migraine.  The ALJ acknowledged Jones' claims that she did not perform some daily activities when she had migraines, such as driving during daylight hours, cooking, and going to church.  But Jones related in her June 2012 Function Report and at the hearing that she is capable of doing laundry and dishes, helping her son with schoolwork, caring for her husband and son, caring for her dogs, talking on the phone, going out alone, shopping weekly, managing her finances, remembering appointments without reminders, and following written and verbal instructions. Such activities are inconsistent with her allegations of total disability.  *See Davis v. Apfel*, 239 F.3d 962, 967 (8th Cir. 2001) ("Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations.")

The ALJ also acknowledged Jones' statements that she had two, to three or four, headaches per week; that migraines caused her to be sensitive to light and sounds, and to have blurred vision and nausea; evidence that she went to the emergency room for migraines on three occasions; and that she was prescribed medications.  But as the ALJ noted, in March 2012 when Jones went to the emergency room for migraine, she admitted she was not taking migraine medication, although it had been prescribed in the past.  For the period April through December 2012, Jones went without seeing Dr. Schwartzman or any other provider for treatment of

migraine or any other condition. Jones also told Dr. Schwartzman at the December 2012 visit that her headaches were less frequent. Jones had an emergency room visit for migraine in February 2013, but did not see Dr. Schwartzman again until June 2013. Jones has never been referred to a specialist for treatment of migraines, or been prescribed therapies more aggressive than management by medication. Jones' allegations of disabling pain are inconsistent with the gaps in her treatment, the conservative treatment received, and failure to seek out more aggressive treatment. *See Davis*, 239 F.3d at 967 (a claimant's allegations of disabling pain may be discounted where the record indicated that she had not made significant efforts to seek medical treatment to alleviate it); *Casey v. Astrue,* 503 F.3d 687, 693 (8th Cir. 2007) (claimant sought treatment "far less frequently than one would expect based on the pain that [he] alleges").

In addition, Jones testified that she had had migraines for 10 to 15 years, and that they had progressively worsened over time. But she was able to work during that time period as an order clerk, in a number of factory jobs, as a restaurant server, and in a photography studio. Jones' ability to work despite such migraine history weighed against her credibility, particularly in view of her recent report to Dr. Schwartzman, in December 2012, that her migraines had become less frequent. *See Orrick v. Sullivan*, 966 F.2d 368, 370 (8th Cir. 1992) (finding that where an individual has worked with impairment over a period of years, absent significant deterioration, it cannot be considered disabling at present).

The ALJ also noted that Jones had had normal diagnostic brain imaging and normal neurological examinations. Although diagnostic imaging and abnormal neurological examinations are not required to diagnose migraines, the absence of objective findings, in the context of the whole record, supports a conclusion that Jones' migraines were not as limiting as alleged. *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997) (although a claimant's subjective

complaints cannot be disregarded solely because they are not fully supported by objective medical evidence, they may be discounted when inconsistent with the record as a whole).

Jones argues that in assessing her credibility, the ALJ over-emphasized and improperly considered records stating she was diagnosed with caffeine dependence and had failed to curb caffeine intake. Jones did have such a diagnosis and there is no evidence that she curbed her caffeine intake. [Tr. 86, 445, 453, 485.] But even disregarding the caffeine issue, the ALJ's credibility determination with respect to Jones' allegations of migraine pain is supported by substantial evidence on the whole record, discussed above.

In view of the foregoing, the ALJ's credibility determination will not be disturbed.

### 2. Left wrist and hand impairments

The ALJ also gave good reasons for discounting Jones' credibility concerning her left wrist and hand impairments, and the determination is supported by substantial evidence on the whole record. At Step 2, the ALJ's findings of severe impairment included status post open reduction fracture of the left wrist in 2008 with removal of the metal in 2013 and left hand numbness, carpal tunnel syndrome, degenerative joint disease, and tenosynovitis. In assessing Jones' credibility, the ALJ discussed the 2008 wrist surgery, and post-surgery reports of worsening pain, swelling, and tingling. The ALJ also explicitly considered Jones' physical examination findings showing tenderness and fullness of the wrist, mild decreased range of motion, and prominence of her plate, which led to surgery to remove the wrist hardware.

However, the ALJ noted that the record of Jones' June 17, 2013 emergency room visit for numbness in the left middle and index fingers and mild pain, showed she was in no distress, and had normal neurological findings, full range of motion, no edema, and no tenderness. The diagnosis was paresthesia and she was instructed to wear a wrist splint at night and continue her

16

medications, including an anti-inflammatory. A July 10, 2013 examination by Dr. Wyrsch revealed no swelling, excellent wrist motion without significant pain, no hand atrophy, and tendons that were not tender. She was also doing well with good reduction of wrist pain on August 12, 2013 and in no acute distress when she saw Dr. Wyrsch. The doctor diagnosed carpal tunnel in the left wrist, and recommended conservative treatment of a night splint and stretching, with follow up in six weeks. Conservative medical treatment is an appropriate factor for an ALJ to consider in evaluating a claimant's credibility. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

The ALJ also concluded that evidence in the record of Jones' daily activities was inconsistent with her allegations of disabling left wrist and hand pain. Although she said it made her hand cramp and it was getting harder to do, Jones listed jewelry making as a hobby. She cared for herself, her son, her husband, and her pets. She wrote in a self-report that for three to four hours almost every day, she cleaned, did laundry and dishes, and cooked dinner. She also drove, traveled alone, and shopped. These activities are inconsistent with her allegations of total disability. *See Davis*, 239 F.3d at 967 ("Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations.").

In discounting Jones' credibility, the ALJ also relied on and gave great weight to the July 2013 opinion of Dr. Ash, the orthopedist, concluding it was well-supported and consistent with the record as a whole. Dr. Ash provided a detailed narrative of his objective findings on physical exam, including limited bilateral wrist range of motion, tenderness, and decreased sensation of the left index and long fingers, but fair grip and pinch strength at four out of five in the left wrist, satisfactory pulses, and equal and active reflexes; normal motion of the shoulders, elbows and forearms; and normal dorsiflexion, radial deviation, and ulnar deviation of the wrists.

17

His only diagnosis related to the left wrist and hand was probable degenerative arthritis in the left wrist. Basing his medical source statement on the objective findings, Dr. Ash opined, among other things, that Jones could lift and carry 11 to 20 pounds occasionally, and up to 10 pounds frequently; could never climb ladders or scaffolds; could occasionally kneel and crawl; could occasionally tolerate exposure to humidity and wetness, extreme cold and heat, vibrations; and could occasionally drive. He opined that Jones could perform all daily activities listed on the form, including shopping, preparing simple meals, caring for personal hygiene, and sorting, handling, or using paper and files. Jones' allegations of disabling left wrist and hand impairment are inconsistent with Dr. Ash's objective findings at minimum, as well as his diagnoses and opinion. *Kisling*, 105 F.3d at 1257.[3]

In view of the foregoing, the ALJ's credibility determination will not be disturbed.

**B.      The RFC**

Jones argues that the RFC is not based on substantial evidence. Residual functional capacity is what a claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a). It is an assessment based upon all of the relevant evidence including a claimant's description of his limitations, observations by treating and examining physicians or other persons, and medical records. 20 C.F.R. § 404.1545(a). Put another way, the RFC must be based upon all of the substantial evidence, and must be supported by at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). The claimant bears the burden of proving her RFC. *See Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005).

An ALJ need only include credible limitations in a hypothetical and RFC, *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014), and that is what the ALJ did here. Substantial evidence

---

[3]      Jones specifically challenges Dr. Ash's opinion in connection with the RFC determination. Those arguments are addressed in following section.

on the whole record, including medical evidence, supports the RFC finding. Specifically, the ALJ accommodated Jones' migraine headaches, and left wrist and hand impairments, as well as morbid obesity and thyroid mass, by limiting her to light work with additional limitations. The restriction to lifting and carrying only 11 to 20 pounds occasionally, and up to 10 pounds frequently, accounted for Jones' left hand and wrist impairments and morbid obesity. The ALJ credited Jones' statement to Dr. Ash that she could walk for one hour at a time without stopping, and her testimony that she could sit for one to two hours at a time, by limiting her to walking and sitting for one hour at a time without interruption. The additional limitations of only standing for one hour at a time, standing and walking for two of eight hours, and sitting for eight hours, further account for her morbid obesity. The postural limitations accounted for her morbid obesity and left wrist and hand impairments. The ALJ accommodated Jones' left wrist and hand impairments and migraines, as well as her statements that she could barely drive, by including a restriction that she could not operate a motor vehicle. The limitation of no vibration and moving mechanical parts also accounted for her left wrist and hand impairments, as well as Jones' statement that she stopped mowing because the vibration hurt her wrist. Finally, the limitation to tolerating only loud noise, as opposed to very loud noise, accounted for Jones' migraines and her statements she was sensitive to sound.

Jones argues that the RFC limitations do not adequately account for limitations caused by her migraine pain. The RFC need only account for the limitations the ALJ finds credible, and as discussed above, the ALJ did not find Jones' allegations entirely credible. Furthermore, whether Jones has persistent pain, at core the "inability to work pain-free is not a sufficient reason to find a claimant disabled." *Martin v. Colvin,* 2013 WL 4060002, at *20 (W.D. Mo. Aug. 10, 2013) (quoting *Gossett v. Bowen,* 862 F.2d 802, 807 (10th Cir. 1988)). *See also*

19

*McGuire v. Apfel,* 151 F.Supp.2d 1260, 1269 (D. Kan. 2001) (same).

Jones argues that the RFC is unsupported because the ALJ relied on Dr. Ash's failure to opine concerning manipulative limitations. The argument fails for several reasons. First, the ALJ based the RFC on the whole record, including medical records, as well as Dr. Ash's objective findings and opinions. *See Dykes*, 223 F.3d at 867 (the RFC must be upon all of the substantial evidence, and must be supported by at least some medical evidence). Even if any reliance the ALJ placed on the doctor's failure to opine concerning manipulative limitations is excluded from consideration, the RFC is still supported by substantial evidence on the whole record, including medical evidence. In other words, such reliance was not prejudicial and therefore does not justify reversal. *Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007) (reversal necessary only when error is prejudicial).

This case is not like the one Jones cites, *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001). [Doc. 9, p. 13.] In *Lauer*, the district court concluded that a doctor's failure to provide an opinion supported the ALJ's decision. But the Eighth Circuit concluded that under the circumstances, "the absence of an opinion does not constitute substantial evidence supporting the ALJ's findings." *Id.* The doctor never indicated that the claimant was unable to engage in work-related activities—the doctor was simply never asked to express an opinion about that issue, so he did not do so. In contrast here, Dr. Ash, an orthopedist, was asked to examine Jones on behalf of Disability Determinations, after the administrative hearing. After performing and documenting a detailed physical examination, the doctor opined among other things that Jones was capable of lifting and carrying up to ten pounds frequently and 20 pounds occasionally; occasionally operating a motor vehicle; occasionally tolerating moving mechanical parts, humidity and wetness, extreme cold and heat, and vibrations; and was not limited in sorting, handling, and

using paper and folders. Such opinions support the RFC determination and account for limitations found credible concerning Jones' left hand and wrist.

But, Jones further argues, because Dr. Ash failed to fill in the section of the form labeled Use of Hands, his opinion should not be construed to mean he concluded Jones had no greater limitations on manipulation. The doctor did not appear to overlook the section, inasmuch as he checked a box there, to indicate Jones was right-handed. [Tr. 494.] He also left an unrelated section on the form, Use of Feet, blank. [*Id.*] Dr. Ash also signed the final page of the form. There, immediately above the signature line, the form provides a space to "state any other work activities which are affected by impairments," and indicates "the limitations above are assumed to be your opinion regarding current limitations" unless otherwise noted. [Tr. 497.] Dr. Ash provided no information concerning additional limitations there. The form, considered as a whole, along with the doctor's narrative of objective findings upon which he based his opinions, is consistent with the doctor's consideration of any limitations, or lack thereof, on Jones' use of her left hand and wrist. Any reliance the ALJ placed on Dr. Ash's failure to provide an opinion addressing manipulative limitations, in addition to the ones explicitly provided, was based on substantial evidence on the whole record.

Citing the DOT numbers for the job titles of the three jobs the ALJ cited identified, including Jones' prior work as an order clerk, Jones further argues that all three require frequent reaching, handling, and fingering, which she says she cannot do. [Doc. 9, p. 13.] Assuming the three jobs are as Jones describes, substantial evidence on the whole record supports the ALJ's finding that Jones can, at the least, perform the work of an order clerk. Specifically, Dr. Ash's objective findings on exam revealed normal ranges of motion of the shoulders, elbows, forearms, and fingers. [Tr. 500.] Dr. Ash observed normal dorsiflexion, radial deviation, and ulnar

Case 6:15-cv-03336-NKL   Document 12   Filed 03/07/16   Page 21 of 23

deviation of the wrists, and some limitation of palmar flexion.  [*Id.*]  He found reflexes were equal and reactive; grip and pinch strength in the left hand were fair, 4/5; and that there was decreased sensation of the left index and long fingers.  [*Id.*]  Dr. Ash included no limitations on reaching, handling, and fingering, and opined that such an individual was not limited in sorting, handling, and using paper and folders.  Furthermore, the VE testified that even with the addition of inability to feel the left first finger, tall finger, and thumb, and the requirement that the claimant be looking at the upper left extremity to know whether she was gripping something, such a claimant could still perform the work of an order clerk.  [Tr. 65-66.]

Jones also argues that while the RFC is for "light work," the VE "identified only sedentary jobs as the standing, walking, and sitting limitations are more consistent with sedentary work." [Doc. 9, p. 13.]  Jones then states the VE testified that "if a person were limited to sedentary work and also limited to no fine manipulation with the left hand, then no work would be available."  [*Id.*]  The argument does not change the analysis.  The RFC does not limit Jones to sedentary work.  In any event, limitations of sedentary or light work, or medium, heavy, or very heavy work, are exertional ones, *i.e.*, they pertain to an individual's ability to meet the strength demand of a job.  20 C.F.R. § 404.1569a(a).  "[M]anipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching" are non-exertional limitations.  *Id.* at (c)(2).  Jones' challenge to the RFC with respect to her left wrist and hand concern non-exertional limitations, and the record does not support a limitation of no fine manipulation with the left hand.

Finally, Jones' argument that reversal is required because the ALJ failed to include a narrative discussion also fails.  As discussed above, the ALJ expressly considered Jones' left wrist and hand impairments, migraines, and the rest of her impairments in formulating an RFC

that accounted for all of her credible limitations. Moreover, where all of the functions that an ALJ specifically addressed in the RFC were those in which he found a limitation, a court can reasonably believe that those functions the ALJ omitted were those that were not limited. *See Depover v. Barnhart,* 349 F.3d 563, 567 (8th Cir. 2003).

The RFC determination is supported by substantial evidence, including medical evidence, on the whole record and will not be disturbed.

## III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  March 7, 2016
Jefferson City, Missouri